# EXHIBIT G

2018 WL 6831618 (Ill.Cir.Ct.) (Trial Pleading)
Circuit Court of Illinois,
Illinois County Department, Chancery Division.
Cook County

540 LAKE SHORE DRIVE CONDOMINIUM ASSOCIATION, Plaintiff,

v.

MCZ DEVELOPMENT CORPORATION, Michael Lerner, Lake Shore Acquisitions, LLC, 540 Lake Shore Acquisitions, LLC, 540 Lsd, LLC, and Chicago Title Land Trust Co. as Trustee Under Trust Agreement Dated July 11, 2018, Defendants.

No. 2018CH15814.
December 20, 2018.

**Verified Complaint**

540 N. Lake Shore Drive Condominium Association, One of Its Attorneys, Daniel W. Tarpey, David G. Wix, Matthew M. Showel, Tarpey Wix LLC, 225 W. Wacker Drive, Suite 1515, Chicago, IL 60606, (312) 948-9090 Office, (312) 948-9105 Fax.

Plaintiff, 540 Lake Shore Drive Condominium Association (the "Association"), for its Verified Complaint against Defendants, MCZ Development Corporation ("MCZ Development"), Michael Lerner ("Lerner"), Lake Shore Acquisitions, LLC ("LSA"), 540 Lake Shore Acquisitions, LLC ("540 LSA"), 540 LSD, LLC ("540 LSD") and Chicago Title Land Trust Co. as Trustee Under Trust Agreement Dated July 11, 2018 ("Chicago Title Land Trust"), states as follows:

## NATURE OF THE ACTION

1. Through a scheme of calculated deceit, targeted bullying and disingenuous scare tactics, Lerner and MCZ Development, in concert with the other Defendants and agents, have engaged in an unlawful strong-arm campaign to purchase the highly sought-after condominium building located at 540 N. Lake Shore Drive (the "Building"). The Association brings this action to prevent Lerner, MCZ Development and the remaining Defendants from reaping significant financial gain based on their fraudulent, deceptive and misleading conduct. Specifically, Defendants coordinated a scheme to decrease the value of the condominium association building located at 540 N. Lake Shore Drive, Chicago (the "Building") and thwart competitive bidding for the sale of the Building so that they could purchase the Building at a fraction of its current market value and made statements, threats and other harassing tactics, which created a sense of fear and panic that led individual unit owners selling their units to Defendants to avoid losing significant sums on their condominium investments. As a result, Defendants obtained a 25% ownership interest of the overall units in the Building and have threatened to block the sale of the Building to a third-party investor at a price that is in excess of $20 million more than the below-market price offered by Defendants to purchase the Building. It is this fraudulent and deceptive conduct, along with the Association's desire to sell the Building at competitive market rates for the benefit of all unit owners, that form the basis of the claims alleged herein.

## PARTIES

2. Plaintiff Association is an Illinois not-for-profit corporation with its principal place of business in Cook County, Illinois.

3. Defendant MCZ Development is an Illinois corporation that conducts business in Cook County, Illinois. Founded in 1985, MCZ Development is a real estate development company that specializes in high-density infill development.

4. Defendant Lerner is a resident of Cook County, Illinois. Lerner is the President of MCZ Development.

5. Defendant LSA is an Illinois limited liability company that conducts business in Cook County, Illinois.

6. Defendant 540 LSA is an Illinois limited liability company that conducts business in Cook County, Illinois.

7. Defendant 540 LSD is an Illinois limited liability company that conducts business in Cook County, Illinois. One of the Managers of 540 LSD is Ryan O'Neill ("O'Neill").

8. Defendant Chicago Title Land Trust is an Illinois corporation that conducts business in C County, Illinois.

## JURISDICTION AND VENUE

9. Jurisdiction and venue are proper in Cook County, Illinois because Defendants all reside or conduct business in Cook County and a substantial portion of the events giving rise to this matter occurred in Cook County.

## FACTS COMMON TO ALL COUNTS

10. The Association was incorporated as an Illinois corporation on or about June 26, 1992.

11. Pursuant to its Articles of Incorporation, the Association administers, governs, and manages property owned on a condominium basis located at 540 N. Lake Shore Drive in Chicago (the "Building" or "Property").

12. To administer and govern its affairs, the Association adopted a certain "Declaration of Condominium Ownership and of Easements, Restrictions, Covenants and By-Laws for 540 North Lake Shore Drive Condominium Association" (the "Declarations"), which was filed with the Cook County Recorder of Deeds on or about June 26, 1992.

13. Pursuant to the Declaration, the Association is administered by a five-member Board (the "Board").

14. Pursuant to Article IX of the Declaration, and in accordance with Section 15 of the Illinois Condominium Property Act (the "Act"), "the Unit Owners, by affirmative votes of at least seventy-five percent (75%) of the total vote, may elect to sell the Property as a whole." Ex 1 at Article IX. In other words, even though the Board controls the day-to-day administration of the Association, the Unit Owners control the crucial decision as to whether, and to whom, the Building should be sold. If more than twenty-five percent (25%) of the Unit Owners vote to oppose a sale, the Building cannot be sold.

15. The Building is a seven-story structure that consists of 149 units and a three-level parking garage located at 450 E. Grand Avenue, Chicago, Illinois (the "Residential portion"). Located in Chicago's Streeterville neighborhood - one of the most sought after real estate markets in the City - the Building is a rare low-rise building along Lake Shore Drive surrounded by high rises on three sides and with direct views of Lake Michigan on the fourth. By some estimates, the market value of the Building if it were to be sold exceeds $100 million.

16. Included in the footprint of the Building is a small commercial space on the first floor that is not part of the Association and is separately owned (the "Commercial portion").

17. On or about January 22, 2016, Lerner, individually, purchased two Units in the Building.

18. Thereafter, Lerner and MCZ Development, in coordination and in disguise with the other Defendants - LSA, 540 LSA, 540 LSD and Chicago Title Land Trust - began purchasing additional Units in the Building. Defendants' purpose in buying multiple Units in the Building was to obtain a sufficient ownership percentage of the total number of Units to oppose any sale of the Building to any third-party investors, thwart competitive bidding for the purchase of the Building and force the Association into selling the Building to MCZ Development (or one of its affiliates) at a price tens of millions below a competitive market rate.

19. Beginning in July 2017 and continuing to the present, Defendants have engaged in deceptive tactics and targeted bullying of Unit Owners in order to take enough control of the Building to force a below-market sale to MCZ Development. Defendants have employed mass mailings and 'robo calls' to Unit Owners, among other things, to mislead Unit Owners, who otherwise did not have their Units on the market and/or were waiting to reap the financial gain that would come from the Building being sold at competitive market rates, as approved by the Board, into selling their units to Defendants.

20. Defendants' tactics included making numerous false and misleading statements regarding their ownership control, threatening to block any sale of the building to other interested purchasers and decreasing the value of the Building in the real estate market to create a sense of panic and fear in individual Unit Owners that they would lose significant value in their investment in their condominiums if they did not sell immediately to Defendants.

21. Defendants routinely enticed reluctant Unit Owners to sell by offering various incentives, including, but not limited to, covering all costs and commissions associated with the sale and, in some instances, by "renting" those Units back to the Unit Owners, often free of charge, so they did not have to immediately relocate elsewhere. These "enticements" were always accompanied by threats that Unit Owners who did not agree to sell would suffer significant diminution in value of their Units.

22. Specifically, MCZ Development and Lerner, either directly or in concert with the remaining Defendants, made numerous false and misleading statements at Board meetings and through mass mailings and 'robo calls' to Unit Owners that they owned a sufficient percentage of the Building's Units (which they did not at the time) to block any sale of the Building to anyone other than MCZ Development. Defendants also threatened Unit Owners, who had not yet sold their Units to Defendants, that they would pay decreased prices in the future if the Owners did not sell immediately to Defendants. This "panic peddle" effort resulted in a number of Unit Owners selling their Units when they otherwise would have not done so.

23. For instance, on or about January 8, 2018, O'Neill, on behalf of MCZ Development, sent a letter to all Unit Owners stating that they would "block" any attempts by the Association to sell the Building to any potential purchasers other than MCZ. In that letter, Defendants falsely represented that with the number of Units they already closed and had under contract, in addition to agreements in place with other Owners, their ownership interests exceeded the 25% threshold necessary to block any future decisions by the Association to sell the Building. Defendants' letter further threatened Owners that the value of the Units would only decline if the Owners failed to sell to MCZ Development and as the Building shifted to rentals.

24. On January 17, 2018, at a meeting held in accordance with the Declaration, the Board formally passed a resolution to retain the services of a law firm to represent the Association with the sale of the Building under Section 15 of the Act as well as to enter into a licensing agreement with CBRE to list the Building for sale.

25. After the Board voted to engage CBRE as its real estate broker and put the Building on the market for sale on January 17, 2018, Lerner and MCZ Development stepped up their scare tactics campaign and continued to make false and misleading statements to accomplish their purpose.

26. At that same January 17, 2018 Board meeting, Lerner claimed that he (in concert with the other Defendants) owned over 25% of the Units and threatened other Unit Owners that he would block any valid offers the Association received for the sale of the Building and again threatened that the value of the Owners' Units would decrease once the Building converted to rental housing.

27. At the time those statements were made in the January 8, 2018 letter and at the January 17, 2018 Board meeting, Defendants did not own in excess of 25% of the Building's Units and did not have a controlling interest to block any sale by the Association. In fact, Defendants' total ownership at that time was less than 18%, obviously less than the 25% threshold required to block any sale.

28. On or about January 30, 2018, O'Neill, again on behalf of MCZ Development, sent another letter to Unit Owners reiterating the same claims and threats as in the January 8, 2018 letter.

29. On February 8, 2018, the Association's lawyers sent a letter to all Unit Owners stating that the information presented by O'Neill, on behalf of Lerner and MCZ Development, in his letters was false and that Defendants only owned an estimated 17.72% interest in Units.

30. Lerner later admitted in a "town hall" meeting on February 8, 2018, held with CBRE and the Association's lawyers to discuss how marketing for the Building would work, that at the time the January 8 and January 30, 2018 letters were sent and statements were made to other Unit Owners at the January 17, 2018 Board meeting, Defendants only had a 17.72% ownership interest.

31. Undeterred by their intentional misrepresentations and despite acknowledging that they did not own a sufficient controlling interest to block any attempts by the Association to sell the Building, Defendants continued to harass the Association and strong-arm Owners into selling.

32. On March 5, 2018, Lerner, on behalf of LSA, sent a letter demanding access to certain documents and records from the Association, including, but not limited to, voting records and related documents, records related to the engagement of CBRE and Board communications relating to the treatment of LSA (and its affiliates). LSA's purported basis for certain Board communications was to ensure that the Association had acted fairly and not discriminated against LSA (or its affiliates) and "understanding the Association's obligations to indemnify Board members for the upcoming personal lawsuits against such parties."

33. On March 22, 2018, Defendants followed through on their threat when 540 LSD filed a lawsuit in the Circuit Court of Cook County, Chancery Division against the Association seeking a declaration that the Board's recent adoption of new rules for the leasing of Units was arbitrary and capricious and diminished 540 LSD's use and enjoyment of Units in the Building. 540 LSD claimed that these new leasing rules were designed to thwart 540 LSD from buying more Units in the Building.

34. On or about April 21, 2018, O'Neill, again on behalf of Lerner and MCZ Development, sent a 'robo call' voicemail message to all Unit Owners falsely claiming that MCZ Development had closed on 40 units over the past 6 months and soliciting any other Owners interested in selling to MCZ Development.

35. At the time of O'Neill's voicemail to all Unit Owners, MCZ Development had not closed on 40 units over the past 6 months. In fact, Defendants combined only had closed on 31 Units, which had taken them a year to do, and had only closed on approximately 12 Units in the previous six months.

36. During the early Fall 2017 through Spring 2018, Lerner attended numerous Association Board meetings and made false and misleading statements designed to further create an environment of concern and panic in the Unit Owners. Specifically, Lerner repeatedly stated that he, in coordination with the other Defendants, controlled a sufficient ownership percentage to block any sale of the Building to competitive bidders and that they would in fact do so. At the time those statements were made, they were false.

37. During this time, Lerner also made statements at the Association's Board meetings that if Unit Owners did not sell to him immediately, he and the other Defendants would be paying less to any Unit Owners that held out when they eventually were forced to sell to Defendants. Lerner was informing Unit Owners that they would be rewarded by maximizing their value by

selling now. Lerner also made verbal assertions that he would not allow the Association to impede his "business plans" for MCZ Development to purchase the Building at a huge discount and that "it's going to get bloody" if he is further challenged in that effort.

38. On May 7, 2018, Defendants continued with their harassment tactics when 540 LSD, LSA and 540 LSA filed a second lawsuit against the Association and the Board members, individually, for defamation, intentional interference with prospective business advantage, and breach of fiduciary duty related to communications sent by the Association to Unit Owners correcting the false and misleading statements being made by Defendants about their ownership percentage and ability to oppose any sale of the Building. That lawsuit recently was dismissed in its entirely without prejudice.

39. Lerner and MCZ Development also falsely exaggerated their ownership interests in the Building in the commercial real estate market to thwart any competitive bids from outside third-parties for the purchase of the Building. In an article appearing in Crain's dated April 19, 2018 about the sale of the Building, a lawyer for MCZ Development was quoted as saying: "They [the Association] might as well throw in the Brooklyn Bridge and the Sears Tower" in the offering. "They [the Association] can't deliver those and they can't deliver this Building."

40. Lerner and MCZ Development, through agents acting on their behalf, spread word in the real estate broker community that MCZ Development owned a controlling interest in the Building to block any sale of the Building and that any attempts by any third-party purchasers would be futile.

41. Lerner and MCZ Development, through agents acting on their behalf, used similar false and misleading tactics to influence the owner of the Commercial portion of the Property to pull out of considering a combined sale of the Commercial portion and the Residential portion, which would generate higher bids than individual sales of the Commercial portion and Residential portion, by claiming that the Residential portion of the Property was in a weaker position to fend off a hostile deconversion due to Defendants' claimed, but false, ownership percentages. As a result, the owner of the Commercial portion of the Property has decided to wait and make a deal with the perceived likely winner of the deconversion of the Association.

42. In the next move in their attack, Lerner and MCZ Development, and its agents, then began making false and misleading statements that the Association did not own "air rights" above the Building and those "air rights" belonged to the owner of the Commercial portion of the Property. The purpose of these statements was twofold: (1) to thwart those interested in purchasing the Building and building "upwards" on top of the existing structure from making any competitive bids; and (2) to make Unit Owners believe that they owned nothing but their condominiums within Building.

43. As a result, on May 16, 2018, the Board was forced to engage the services of surveyor and a law firm to determine the Association's "air rights" ownership to counter these inaccurate and misleading statements. The conclusion reached was that the Association does in fact own the "air rights" above the Residential portion and garage parcel.

44. On or about June 8, 2018, MCZ Development indicated that it would only offer $47 million for the purchase of the Building. Based on a trusted and reliable market valuation from an independent, outside source, MCZ Development's offer was tens of millions below the market value of the Building.

45. On or about June 8, 2018, a lawyer on behalf of LSA also sent a letter to all Unit Owners falsely stating that LSA (and its affiliates) owned and controlled more than 25% of the Units. LSA further stated that no matter what marketing efforts the Board was undertaking to sell the Building, no sale could take place without LSA's consent and that LSA "will not be consenting to any such sale." LSA's lawyer stated that the value of the Units would continue to decline because, in part, as LSA continued to obtain more Units, the value of the Units would decline "significantly" because "[p]rospective owners will fear the Building's imminent conversion" and LSA "will decrease [not increase] its offer" to purchase Units in the future. LSA offered to continue to buy Units but stated that the offer would only remain open for the earlier of 30 days or until LSA reached 50% ownership. The offered price was based on MCZ Development's under-market valuation of the Building at $47 million.

46. As of June 8, 2018, neither LSA nor any of the other Defendants owned units constituting 25% or more of the total Units in the Building.

47. On June 22, 2018, the Board, through its attorneys, sent a 'Notice to Cease and Desist' letter to LSA regarding the false statements contained in the June 8, 2018 about Defendants' percentage of ownership and specifically referencing that O'Neill admitted in an open Board meeting on June 20,2018 that Defendants owned less than 25% ownership in the Building.

48. On or about July 13, 2018, LSA sent a letter to all Unit Owners stating that Defendants now owned more than 25% ownership in the Building. LSA claimed Defendants owned 36 units - four less than what Defendants claimed it owned in O'Neil's voicemail three months earlier - with more Units allegedly "under contract" which pushed the total ownership over the 25% threshold.

49. At the time Defendants made this statement on July 13, 2018, they still had not closed on nor owned Units totaling 25% of the ownership of the Building.

50. It was not until on or about September 2018, after a year-long campaign fraught with fraud and deceitful scare tactics, that Defendants' closed on a purchase of a Unit that resulted in Defendants ownership of Units barely exceeding the 25% threshold of total Units.

51. At that point, Defendants only continued with its tactics to create a sense of fear and panic in Unit Owners and increase their ownership interests. For instance, on September 10, 2018, O'Neill, on behalf of LSA, sent another letter to all Unit Owners claiming LSA has "maintained a position of control in excess of 25% for some time" based on pending sales under contract and stating that LSA "is not interested in selling the building to an outside party." He further stated that any effort by the Association to sell the Building "would seem be a waste of time and money, and perhaps an effort at creating further confusion and toxicity."

52. On November 19, 2018, LSA's lawyer wrote a letter to all Unit Owners regarding LSA's plans to explore partnering with a low-income housing group to provide some of the Building's Units "to those needing long term housing assistance" with no lease to be signed and at no rent to those families. Although couched in terms of "helping those most in need," the real purpose of this communication was to give the appearance of decreasing the overall value of the Building and misleadingly "incentivize" Unit Owners to sell to Defendants.

53. On or about December 8, 2018, O'Neill, on behalf of 540 LSD, sent all Unit Owners a postcard offering an additional $10,000 above the negotiated price on contracts accepted and signed before the end of the year.

54. On or about November 14, 2018, the Association received an offer from a third-party not affiliated with Defendants to purchase the Building for $68 million.

55. On November 28, 2018, at a "town hall" meeting of Owners regarding the $68 million offer that was received, Lerner indicated that he and the other Defendants would vote 'no' on accepting the offer and stated unconditionally and unequivocally that the Building is not for sale.

56. Being left no further options and now being held hostage by Lerner and MCZ Development's scheme to purchase the Building at more than at least 30% below market, on December 20, 2018, at a scheduled Board meeting open to all Unit Owners, the Board, in accordance with the Declarations and Illinois law, properly voted to authorize the filing of this lawsuit.

### COUNT I

**Temporary, Preliminary and Permanent Injunctive Relief**

57. The Association incorporates paragraphs 1 through 56 as if fully restated here.

58. Defendants' actions and false and misleading statements have resulted in creating an environment of concern and panic in the individual Unit Owners of the Building, which has caused Owners who may not have otherwise chosen to sell their Units to sell to Defendants out of fear that prices for their Units will go lower. This has resulted in Defendants obtaining an ownership percentage that exceeds the threshold for Defendants to block any sale of the Building to interested third-party investors.

59. Defendants' actions, ncluding, but not limited to, the filing of lawsuits against the Association, and false and misleading statements have resulted in stifling competition in the real estate market, which has significantly reduced competitive, fair and reasonable offers for the purchase of the Building based on the current market value of the Building. This has resulted in individual Unit Owners believing that their only option for getting the best value out of their Units is to sell to Defendants - for fear of a declining price market created by Defendants - instead of holding out for a better bid in an open competitive market that otherwise would have occurred but for Defendants' actions.

60. Defendants' actions and false and misleading statements have resulted in a significant reduction in the rental rates in the Building from historical levels, which is in stark contrast to the trend locally and nationally, and also in surpassing the 30% rental cap in the Building. Unit Owners who want to rent their Units are forced to wait until several months before they have clearance to rent out their Units. Many Unit Owners that utilize their Units as rental investments are forced to sell to Defendants when confronted with having to wait to rent their Units or the decreasing rental prices.

61. Defendants have made a "low-ball" offer of $47 million to purchase the Building that is significantly below the market value of the Building given its location and over $20 million below the only other offer the Association has received for the purchase of the Building.

62. Defendants have made known their intention to block the sale of the Building to any other third-party, including the sale of the Building for the current offer of $68 million.

63. The Association has a protectible interest in receiving competitive offers for the purchase of the Building and in approving a sale for the highest possible price to maximize the profits to individual Unit Owners.

64. The Association (and individual Unit Owners) will suffer irreparable harm if the Court does not issue injunctive relief that prevents Defendants from benefitting from its deceptive and fraudulent actions, including blocking the sale of the Building for offers greater than Defendants' current offer and artificially reducing competition for bids for the sale of the Building, and that prevents Defendants from engaging in similar practices of creating concern, confusion and panic to obtain additional ownership interests in the Building so that Defendants can unilaterally force a deconversion of the Building from condominiums to rentals at the expense of individual Unit Owners who have not agreed to sell their Units to Defendants.

65. The Association has no adequate remedy at law because it is unable to sell the Building at a competitive price and continues to lose opportunities to engage in a competitive bidding process for the sale of the Building due to Defendants deceptive and fraudulent actions.

66. The Association has a strong likelihood of success on its actions for fraud, conspiracy and tortious interference with business expectancy against Defendants.

67. Defendants will not be harmed by injunctive relief because they will also profit from the sale of the Building at competitive, market value rates because the value of the Units that they own will increase.

WHEREFORE, the Association respectfully requests that this Court enter temporary, preliminary and permanent injunctive relief in favor of the Association and against Defendants on Count I that: (1) prohibits Defendants from any further

communications with Unit Owners containing false and misleading statements; (2) prohibits Defendants from engaging in tactics that are designed to create a sense of concern and panic with Unit Owners; (3) prohibits Defendants from any further communications with Unit Owners seeking to purchase Units or offering incentives to entice Unit Owners to sell to Defendants; and (4) prohibits Defendants from voting to block any sales of the Building at prices above the current offer of $47 million by Defendants; and for any other relief this Court deems just and proper.

## COUNT II

### Declaratory Judgment

68. The Association incorporates paragraphs 1 through 56 as if fully restated here.

69. As alleged above, Defendants have obtained their 25% ownership interest in the Building through false, misleading and deceptive means.

70. Equity principles do not permit Defendants to derive any benefit from a fraud perpetrated by them.

71. The Association has a legal, tangible interest in being able to sell the Building at competitive, market price, or, at a minimum, at a price higher than Defendants' current offer.

72. Defendants have stated publicly that they will oppose and not approve the sale of the Building to any third-party, regardless of the offer, and will only approve a sale at the price offered by Defendants.

73. There is an actual controversy between the parties regarding the price at which the Building can be sold and whether Defendants can reap the benefits of their fraudulent, deceptive and misleading conduct in obtaining a 25% interest in the ownership of the Building.

WHEREFORE, the Association respectfully requests a judgment in its favor and against Defendants on Count II declaring that (1) Defendants obtained their 25% ownership interest in the Building through false and deceptive means; and (2) Defendants are prohibited from voting to block any sale of the Building for price that exceeds the price being offered by Defendants; and for any other relief this Court deems just and proper.

## COUNT III

### Fraud

74. The Association incorporates paragraphs 1 through 56 as if fully restated here.

75. As alleged above, Defendants have made false and misleading statements regarding its ownership interests in the Building for the purposes of creating panic and concern in the individual Unit Owners.

76. As alleged above, Defendants have made false and misleading statements regarding its ownership interests in the Building for the purposes of stifling competition for the sale of the Building and to artificially decrease the value of the Building to potential purchasers of the Building.

77. At the time Defendants made these false and misleading statements, they knew the statements to be false.

78. Defendants made these false and misleading statements to deceive individual Unit Owners to sell their Units to Defendants.

79. Defendants made these false and misleading statements to reduce competition for bids to purchase the Building so that they could force the Association to sell the Building to Defendants for a price significantly below market value.

80. Defendants have benefitted from their false and misleading statements by being able to block the sale of the Building to other potential third-party purchasers and force the sale of the Building to Defendants at a price well-below market value.

81. Individual Unit Owners reasonably relied on Defendants' false and misleading statements in agreeing sell their Units to Defendants.

82. Potential third-party purchasers of the Building reasonably relied on Defendants' false and misleading statements in deciding to forgo making offers to purchase the Building.

83. As a result of Defendants' false and misleading statements, the Association has incurred, and will continue to incur, damages.

WHEREFORE, the Association respectfully requests that this Court enter judgment in its favor and against Defendants on Count III in an amount to be proven at trial, but not less than $21 million, punitive damages and for any other relief this Court deems just and proper.

## COUNT IV

### Civil Conspiracy

84. The Association incorporates paragraphs 1 through 56 as if fully restated here.

85. Defendants reached an agreement for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means.

86. Specifically, Defendants agreed to use fraudulent and deceptive means to obtain ownership interests in individual Units in the Building and further agreed to combine their collective voting interests to block the sale of the Building to any potential third-party purchasers.

87. Defendants knew that it was unlawful to obtain their ownership interests in the Building by the means that they did and that it was unlawful to act in concert to block the sale of the Building for their own pecuniary gain.

88. Defendants agreed with each other to and in fact engage in a concerted effort to unlawfully obtain ownership interest in individual Units, thwart competition in proposed offers to purchase the Building and then vote to block the sale of the Building to anyone but themselves all to the detriment of the Association and individual Unit Owners.

89. Defendants not only understood the general objections of their conspiratorial scheme, but accepted them, and acted to further those objectives.

WHEREFORE, the Association respectfully requests that this Court enter judgment in its favor and against Defendants on Count IV in an amount to be proven at trial, but not less than $21 million, and for any other relief this Court deems just and proper.

## COUNT V

### Tortious Interference with Business Expectancy

90. The Association incorporates paragraphs 1 through 56 as if fully restated here.

91. The Association has a reasonable expectancy to enter into a contract for sale of the Building at the highest possible price for the benefit of the Association and all individual Unit Owners.

92. Defendants know and have known of the Association's expectancy to enter into a sale of the Building at the highest possible price.

93. Defendants knowingly and tortiously interfered with that relationship by the conduct and actions alleged herein.

94. Defendants' interference with the Association's business expectancy has caused, and will continue to cause, damage to the Association and individual Unit Owners.

WHEREFORE, the Association respectfully requests that this Court enter judgment in its favor and against Defendants on Count V in an amount to be proven at trial, but not less than $21 million, and for any other relief this Court deems just and proper.

**COUNT VI**

**Tortious Interference with Contract**

95. The Association incorporates paragraphs 1 through 56 as if fully restated here.

96. On or about March 9, 2018, the Association entered into an Exclusive Sales Listing Agreement with CBRE ("Agreement").

97. The purpose of the Agreement was for CBRE to market and offer the Property, which included the Building and the parking garage, for sale for the benefit of the Association.

98. Defendants are and have been aware of the Association's contract with CBRE.

99. Defendants intentionally and unjustifiably have attempted to induce a breach of the Agreement by thwarting potential purchasers from making bids for the Property, making false statements that have resulted in the decreased value of the Property and blocking or threatening to block the sale of the Property to potential interested buyers.

100. The Association has been damaged by Defendants' intentional interference with the Agreement.

WHEREFORE, the Association respectfully requests that this Court enter judgment in its favor and against Defendants on Count VI in an amount to be proven at trial and for any other relief this Court deems just and proper.

DATED: December 21, 2018

Respectfully submitted,

540 N. Lake Shore Drive Condominium Association

/s/ Daniel W. Tarpey

One of Its Attorneys

Daniel W. Tarpey

David G. Wix

Matthew M. Showel

TARPEY WIX LLC

225 W. Wacker Drive, Suite 1515

Chicago, IL 60606

(312) 948-9090 Office

(312) 948-9105 Fax

---

**End of Document**  © 2023 Thomson Reuters. No claim to original U.S. Government Works.