IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ABERDEEN DEVELOPERS, LLC, | |
| Plaintiff, | No. 23-cv-14279 |
| v. | Judge John F. Kness |
| WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR REGISTERED HOLDERS OF DEUTSCHE MORTGAGE & ASSET RECEIVING CORPORATION, CD2019-CD8 MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2019-CD8, a National Bank, and LNR PARTNERS, LLC, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Aberdeen Developers, LLC, brought this breach of contract suit alleging, among other things, that a loan contract between the parties requires that Defendant LNR Partners, LLC disburse certain accumulated funds to Plaintiff. Plaintiff seeks release of the funds and a declaration that the contract unambiguously requires that release. Defendants move to dismiss a portion of the complaint on the grounds that the contract unambiguously establishes the opposite—that is, that the funds Plaintiff seeks are correctly held in escrow.

As explained below, the loan agreement unambiguously does not require release of the disputed funds. Accordingly, Defendants' motion is granted.

## I. BACKGROUND

Plaintiff Aberdeen Developers secured a loan by offering as collateral a mixed-use building in Chicago, Illinois ("the property"). (Dkt. 24 ¶ 1.) That loan was packaged with other loans and sold as commercial mortgage-backed securities; Defendant LNR Partners is now the "special servicer" of Plaintiff's loan. (*Id.*) Defendant Wells Fargo is the trustee of the securitized mortgage trust CD 2019-CD8. (*Id.*) The original lender plays no role in enforcement of provisions of the loan. (*Id.*)

Two loan documents govern the present dispute: the Loan Agreement and the Cash Management Agreement (CMA) (together, "Loan Documents"). Plaintiff attests that it attached true and accurate copies of each to the complaint. (*See* Dkt. 24-1, 24-6.) Plaintiff is referred to as "Borrower" and Defendant LNR Partners is "Lender" in the Loan Documents.

Plaintiff explains that during the COVID-19 pandemic, the two largest tenants of the building securing the loan stopped paying rent. (Dkt. 24 ¶ 2.) Even though Plaintiff continued to make all payments, Defendant LNR deemed those two lease defaults "Cash Sweep Trigger Event[s]" as defined by the CMA. (*Id.* ¶ 3.) Section 3.4 of the CMA dictates that after the occurrence of a Cash Sweep Trigger Event, funds from Plaintiff be "swept" into a Cash Management Account. (*Id.*; Dkt. 24-6 at 11.) Those funds are then distributed in a specific order of priority as established in CMA Section 3.4 subsections (a)–(h). (*See* Dkt. 24-6 at 11–12.) Any funds left over after

2

those disbursements are deemed "Excess Cash Flow" and "shall be deposited into a separate subaccount . . . to be held by Lender as additional security for the Loan[.]" (*Id.* at 12 (subsection 3.4(i)).) Immediately following is subsection 3.4(j), which reads: " . . . all Excess Cash Flow shall be disbursed to, or at the written direction of, Borrower." (*Id.*)

Plaintiff alleges that despite the loss of its two largest tenants, Plaintiff is making payments such that the excess cash flow in the cash management account exceeds two million dollars. (Dkt. 24 ¶ 6.) Plaintiff has demanded disbursement of these funds under subsection 3.4(j), but Defendants have refused to comply. (*Id.* ¶¶ 7–8.)

Plaintiff sued Defendants seeking breach of contract damages and a declaration that, among other things, Plaintiff is entitled to the excess cash flow. (Dkt. 24 ¶¶ 89–108.) Defendants have moved to dismiss Count I and a portion of Count III of the complaint, arguing that the loan documents unambiguously establish that Plaintiff has no contractual right to the disbursement of the excess cash flow. (*See generally* Dkt. 31.)

## II. STANDARD OF REVIEW

A motion under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Ord. of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Each complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp.*

3

*v. Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Put another way, the complaint must present a "short, plain, and plausible factual narrative that conveys a story that holds together." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 777 (7th Cir. 2022) (cleaned up). In evaluating a motion to dismiss, the Court must accept as true the complaint's factual allegations and draw reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678. But even though factual allegations are entitled to the assumption of truth, mere legal conclusions are not. *Id.* at 678–79.

When faced with a dispute over interpretation of contractual provisions, a court " 'must initially determine, as a question of law, whether the language of a purported contract is ambiguous as to the parties' intent.' " *Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 526 (7th Cir. 2022) (quoting *Quake Constr., Inc. v. Am. Airlines, Inc.*, 565 N.E.2d 990, 994 (Ill. 1990)). A contractual provision is ambiguous if it is "subject to more than one reasonable interpretation . . . ." *Elson v. State Farm Fire & Casualty Co.*, 691 N.E.2d 807, 811 (Ill. App. Ct. 1998). If the court determines that the language in question is ambiguous, " 'the interpretation of the language is a question of fact which a [ ] court cannot properly determine on a motion to dismiss.' " *Kap Holdings*, 55 F.4th at 526 (quoting *Quake Constr.*, 565 N.E.2d at 994).

State law governs contract interpretations in diversity cases,[1] and "Illinois uses in general a 'four corners' rule in the interpretation of contracts, holding, as we

---

[1] Diversity jurisdiction under 28 U.S.C. § 1332(a) exists in this case. Plaintiff, Aberdeen Developers, is a Delaware LLC whose sole member is Aberdeen Developers Holdco LLC,

4

have previously remarked, that 'if the language of a contract appears to admit of only one interpretation, the case is indeed over.' " *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998) (quoting *AM Internat'l Inc. v. Graphic Management Associates, Inc.*, 44 F.3d 572, 574 (7th Cir. 1995)). This is so because "[i]f a single definite meaning can reasonably be imputed to [the disputed terms], the contract is not ambiguous and its language controls." *Id.* at 1037. Where both parties argue that the language is unambiguous but the parties' interpretations of the language differ, if the court "find[s] one proposed interpretation to be reasonable, [the court] must ascertain whether the other interpretation is likewise reasonable." *Id.*

---

which has four members, all of whom are Illinois citizens (Dkt. 57 at 1–2). To determine the citizenship of an LLC, citizenship "must be traced through however many layers of partners or members there may be." *Meyerson v. Harrah's East Chicago Casino*, 299 F.3d 616, 617 (7th Cir. 2002). An LLC is a citizen of every state in which its members are citizens. *Thomas v. Guardsmark*, LLC, 487 F.3d 531, 534 (7th Cir. 2007). The Seventh Circuit has "held repeatedly that there's no such thing as a [state name here] partnership or LLC, [ ] only the partners' or members' citizenships matter." *West v. Louisville Gas & Elec. Co.*, 951 F.3d 827, 829 (7th Cir. 2020). Thus, Plaintiff Aberdeen Developers is a citizen of Illinois for purposes of diversity jurisdiction.

Defendant Wells Fargo is a South Dakota Citizen, because that is where its main office is located. (Dkt. 59 at 2); *see Wachovia Bank, N.A. v. Schmidt, III*, 546 U.S. 303, 307 (2006). Defendant LNR is a single-member Florida LLC whose sole member is a single-member LLC (LNR Partners Parent, a Delaware LLC), whose sole member is a single-member LLC (LNR RESFG holdings, a Florida LLC), whose sole member is a single-member LLC (Leisure Colony Management, a Florida LLC), whose sole member is a single-member LLC (LNR Property, located in Delaware), whose sole member is a single-member LLC (SPT LNR Property, TRS, located in Delaware), whose sole member is a single-member LLC (SPT LNR Property, located in Delaware), whose sole member is Starwood Property Trust, a corporation. Starwood is incorporated in Maryland and has its principal place of business in Connecticut, which makes it a citizen of both Maryland and Connecticut. *See* 28 U.S. Code § 1332(c)(1). Tracing LNR's citizenship down to Starwood, then, LNR is a citizen of Maryland and Connecticut. *See Meyerson*, 299 F.3d at 617.

Because Plaintiff is a citizen of Illinois and Defendants are citizens of South Dakota, Maryland, and Connecticut, diversity jurisdiction exists in this case.

5

**III. DISCUSSION**

Analysis of the issues presented begins with Defendants' proposed interpretation of the relevant contractual language. If that interpretation is reasonable, the Court will then consider Plaintiff's proposed interpretation. *See Bourke*, 159 F.3d at 1037. If Plaintiff's interpretation is also reasonable, then the contract is ambiguous. *Id.* If Plaintiff's interpretation is not reasonable, then there is no ambiguity for the Court to resolve, and the Court may determine the "[contract's] meaning as a matter of law." *Id.*

**A. Defendants' proposed interpretation is reasonable**

Defendants contend that the totality of the contractual agreement unambiguously establishes that Plaintiff is not entitled to disbursement of the excess cash funds. (Dkt. 31 at 7.) Specifically, Defendants rely on the language of CMA sections 3.3 and 3.4 and section 6.3 of the Loan Agreement to support this interpretation. (*Id.*)

*1. Relevant provisions of the Loan Documents*

CMA Section 3.3

CMA Section 3.3 is entitled "Transfers to the Cash Management Account." That provision reads:

> Deposit Bank shall transfer all available amounts (less the reasonable fees of Deposit Bank and any required Minimum Balance) on deposit in the Clearing Account as follows: (i) prior to the occurrence of a Cash Sweep Trigger Event, to the Borrower Operating Account, and (ii) upon Disposition Instructions pursuant to the Deposit Account Control Agreement from Lender of the occurrence of a Cash Sweep Trigger Event, and not less frequently than as set forth in the DACA, to the Cash Management Account, until such time, if any, that Lender shall provide

6

> written Disposition Instructions pursuant to the Deposit Account Control Agreement to Deposit Bank to otherwise disburse funds. Lender shall provide written Notice and instructions to Deposit Bank of the requirement to transfer funds to the Cash Management Account or as otherwise directed by Lender. In the event that a Cash Sweep Event Period shall no longer exist, Lender shall provide written Notice and instructions to Deposit Bank to disburse funds thereafter deposited into the Clearing Account to the Borrower Operating Account and at Lender's discretion, Lender shall either apply in accordance with Section 3.4 of this Agreement or disburse the then current balance of funds related solely to the Premises (but not any other property) that are held in the Cash Management Account and the Sweep Account, as applicable, to the Borrower Operating Account.

(Dkt. 24-6 at 10–11.)

CMA Section 3.4

CMA section 3.4, titled "Application of Cash Management Account Funds," establishes the priority of disbursements from the CMA. (*Id.* at 11–12.) Section 3.4 includes subsections 3.4(a)–(j) and explains that disbursements from the CMA shall be applied in the order of the subsections: subsection 3.4(a), disbursements to tax and insurance escrow funds, are to be disbursed first; 3.4(b), disbursements for taxes and insurance in the event of no escrow funds, are to be disbursed second; 3.4(c), disbursements for bank fees, are to be disbursed third; and so on through 3.4(j). (*Id.*)

At issue in this case are subsections 3.4(i) and (j). Subsection 3.4(i) reads: "Ninth, all amounts then remaining after payment of items (a) through (h) (the "**Excess Cash Flow**"), shall be deposited into a separate subaccount (the "**Sweep Account**") to be held by Lender as additional security for the Loan." (Dkt. 24-6 at 12 (emphasis in original).) Subsection 3.4(j) reads: "Tenth, all Excess Cash Flow shall be disbursed to, or at the written direction of, Borrower." (*Id.*)

7

Loan Agreement Section 6.3

Section 6.3 of the Loan Agreement is titled "Cash Management." (Dkt. 24-1 at 65.) Subsection 6.3(b) reads:

> Following the occurrence and during the continuance of a Cash Sweep Trigger Event, Borrower acknowledges that all proceeds on deposit in (and subsequently deposited into) the Clearing Account shall be transferred to and held in the Cash Management Account (as defined in the Cash Management Agreement) as additional Collateral under the Loan. Following a Cash Sweep Cure and provided no Event of Default is then occurring, all funds on deposit in the Cash Management Account shall be immediately remitted to Borrower in accordance with the Cash Management Agreement.

(*Id.*)

### 2. Defendants' interpretation

Defendants argue that these selected provisions "together confirm that Lender is entitled to retain Excess Cash Flow during a Cash Sweep Event Period . . . as additional collateral under the Loan." (Dkt. 31 at 7.)

Central to Defendants' interpretation is the initiation, pendency, and conclusion of the Cash Sweep Event Period, and the actions that must or may be taken at each interval. As Defendants explain, "[a] 'Cash Sweep Event Period' is, at a high-level, the period of time during which a Cash Sweep Trigger Event has occurred and is continuing, and until 'a Cash Sweep Cure['] has occurred." (*Id.* at 4 n.6 (citing Dkt. 24-6 at 3).) Neither party disputes that Defendants properly declared Cash Sweep Trigger Events when the Property's two main tenants failed to pay rent; these trigger events instigated a Cash Sweep Event Period. (*See* Dkt. 24 at 13; Dkt. 31 at 5.) And the parties do not dispute that no Cash Sweep Cure has occurred, which

8

would end the Cash Sweep Event Period (*see generally* Dkt. 41; Dkt. 43 at 3). At present, then, and in the absence of a contrary indication from either side, the Cash Sweep Event Period remains ongoing.

Defendants argue that the terms highlighted above provide that during a Cash Sweep Event Period, funds must be maintained in the Cash Management Account and Defendants retain the power to disburse those funds. (Dkt. 31 at 7.) Defendants contend that under this interpretation of the Loan Agreement, they have properly retained—that is, declined to disburse to Plaintiff—the funds at issue. (*Id.*)

Defendants also argue that their interpretation is reasonable even in the absence of CMA section 3.3 and section 6.3 of the Loan Agreement. (Dkt. 31 at 9–10.) The order of CMA section 3.4 establishes that subsection 3.4(i), which provides that "excess cash flow *shall* be deposited into a separate subaccount . . . *to be held by Lender as additional security for the Loan*", has priority over subsection 3.4(j), which provides that "all excess cash flow shall be disbursed to, or at the written direction of, Borrower." (Dkt. 24-6 at 12.) Nothing in the contract, Defendants argue, allows a later subsection of CMA section 3.4 to jump an earlier one: subsection 3.4(j)'s grant of disbursement to Plaintiff, therefore, cannot displace Defendants' contractual right under subsection 3.4(i) to hold the excess cash flow as additional security. (Dkt. 31 at 9–10.)

Plaintiff counters that Defendants' reading ignores and contradicts the plain language of subsection 3.4(j). (Dkt. 41 at 5.)

9

*3. Analysis*

Defendants' interpretation of the contract language is reasonable. CMA section 3.3 provides that, during a Cash Sweep Event Period, funds are to be deposited into the Cash Management Account "until such time, if any, that Lender shall provide written Disposition Instructions . . . to otherwise disburse funds." (Dkt. 24-6 at 10–11.) CMA section 3.4 establishes that all funds in the Cash Management Account remaining after the required priority payments listed in subsections 3.4(a)–(h) are "held by Lender as additional security for the Loan." (*Id.* at 12.) And Section 6.3 of the Loan Agreement requires that "all proceeds on deposit in (and subsequently deposited into) the Clearing Account shall be transferred to and held in the Cash Management Account . . . as additional Collateral under the Loan." (Dkt. 24-1 at 65.) A Cash Sweep Event Period is ongoing, so, as all three provisions set forth, funds in the Cash Management Account are to remain there providing additional security for the Loan unless Lender decides otherwise or a Cash Sweep Cure occurs.

Plaintiff's argument that Defendants' interpretation essentially writes out CMA subsection 3.4(j) is unpersuasive. Section 6.3 of the Loan Agreement also establishes that funds in the Cash Management Account are "immediately remitted to Borrower" following a Cash Sweep Cure. (Dkt. 24-1 at 65.) And CMA section 3.3 requires Lender, "[i]n the event that a Cash Sweep Event Period shall no longer exist," either to comply with CMA section 3.4 (including subsection 3.4(j)) or to disburse CMA funds to Borrower. (Dkt. 24-6 at 11.) Under Defendants'

10

interpretation, CMA subsection 3.4(j) still has its place: CMA funds are disbursed to Borrower upon conclusion the Cash Sweep Event Period.

Plaintiff argues that "Section 3.3 addresses 'Transfers *to* the Cash Management Account—not disbursements *from* the [Cash Management Account]." (Dkt. 41 at 5.) But that is not an accurate statement of the scope of Section 3.3. Rather, the latter portion of Section 3.3 establishes that once a Cash Sweep Event Period ends, Lender must either apply Section 3.4 or disburse to Borrower remaining funds in the CMA related to the Premises. (Dkt. 24-6 at 11.)

Plaintiff's other attempts to render Defendants' interpretation deficient also fail. Plaintiff argues that Defendants' interpretation "suggests that the entire waterfall of priority of payments of CMA section 3.4(a)–(j) is surplusage." (Dkt. 41 at 7.) Not so: Defendants' interpretation properly gives priority to CMA subsection 3.4(i), which allows Defendants to retain excess cash flow as additional security on the Loan, over subsection 3.4(j). Plaintiff's contention that Defendants misread CMA section 3.3 by reading into it an "excuse[] from applying funds as required by CMA section 3.4(j)" (Dkt. 41 at 9) also misses the mark, as section 3.3 directs funds to be deposited into the cash management account upon the occurrence of a Cash Sweep Trigger Event and "until such time, if any, that Lender shall [direct] Deposit Bank to otherwise disburse funds" (Dkt. 24-6 at 10–11.) Funds in the cash management account are to be applied pursuant to CMA section 3.4, which, again, establishes priority of Defendants' retention of the funds (subsection 3.4(i)) over disbursement to Plaintiff.

11

In sum, Defendants' interpretation of the relevant contract language is reasonable. If Plaintiff's interpretation is also reasonable, then the language is ambiguous. *See Bourke*, 159 F.3d at 1037.

## B.     Plaintiff's proposed interpretation is unreasonable

Plaintiff interprets the relevant contractual language as requiring that excess cash flow be immediately distributed to Plaintiff. (Dkt. 41 at 1.) Plaintiff argues that this interpretation is correct because CMA subsection 3.4(j) unambiguously requires the excess cash flow be disbursed to Plaintiff.[2] (*Id.*) Plaintiff premises its argument almost exclusively on the language of subsection 3.4(j). (*Id.* at 4.)

Defendants contend that Plaintiff's interpretation cannot be squared with the language of the other relevant provisions of the Loan. (Dkt. 31 at 7.) Defendant argues that Plaintiff's reading essentially eliminates subsection 3.4(i), which comes before 3.4(j) in the section 3.4 list of priority. (Dkt. 31 at 9–10.) Plaintiff attempts to harmonize subsections 3.4(i) and 3.4(j) by arguing that 3.4(i) requires the excess cash flow to be held by Lender *until* it is disbursed under 3.4(j). (Dkt. 41 at 2.) Defendants counter that the Loan Documents "do not provide that Lender's interest in Excess Cash Flow is ephemeral and lasts only for the snapshot in time between" application of subsections 3.4(h) and 3.4(j). (Dkt 43 at 3.) That "ephemeral" result would be contrary to the language of subsection 3.4(i), which provides that the excess cash flow

---

[2] Plaintiff also argues that this interpretation is correct because Plaintiff has requested that Defendants disburse the funds and because Defendants are motivated to retain the funds given the substantial interest the funds are generating. (Dkt. 41 at 1.) Although these allegations are relevant to the proffered story of the case, they are irrelevant in this analysis that is cabined, at least at this stage, to the "four corners" of the contract. " *Bourke,* 159 F.3d at 1036.

12

"be held by Lender as additional security for the Loan." (Dkt. 24-6 at 12.) Defendants cannot be entitled to hold funds as security and also be required to immediately disburse those funds to Plaintiff.

Plaintiff's interpretation, cabined as it is to the language of CMA subsection 3.4(j), is therefore unreasonable. Under Illinois law, words "derive their meaning from the context in which they are used," and a contract "must be construed as a whole, viewing each part in light of the others. The intent of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself." *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007) (internal citation omitted). Taken as a whole, the Loan Documents do not require disbursement of the excess cash flow to Plaintiff while the Cash Sweep Event Period remains ongoing.

Because there is only one reasonable interpretation of the contract, it is, as a matter of law, unambiguous, and its language controls. *See Bourke*, 159 F.3d at 1037.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss Count I and that portion of Count III relating to excess cash flow amounts is granted.

SO ORDERED in No. 23-cv-14279.

Date: November 25, 2024

　　　　　　　　　　　　　　　　　　　*/s/ John F. Kness*
　　　　　　　　　　　　　　　　　　　JOHN F. KNESS
　　　　　　　　　　　　　　　　　　　United States District Judge

13